IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ORTHODONTIC CENTERS OF          )
ILLINOIS, INC.,                 )
                                )
     Plaintiff/Counterdefendant, )
                                )
     v.                         )     No.  04 C 6852
                                )
CHRISTINE MICHAELS, D.D.S., P.C., )
and CHRISTINE MICHAELS, D.D.S.,  )
                                )
     Defendants/Counterplaintiffs. )

## MEMORANDUM OPINION AND ORDER

Orthodontic Centers of Illinois ("Orthodontic Centers"),

invoking federal jurisdiction on diversity grounds, has sued

Christine Michaels, D.D.S., P.C. and Christine Michaels, D.D.S.

(for convenience collectively "Dr. Michaels," treated as a

singular feminine proper noun), asserting various claims stemming

out of its business relationship with Dr. Michaels.  Orthodontic

Centers has moved for partial summary judgment pursuant to Fed.

R. Civ. P. ("Rule") 56 on two of those claims:  breach of

contract and default on five promissory notes.  In turn Dr.

Michaels has advanced two counterclaims asserting breach of

contract and breach of fiduciary duty, and she has moved for

summary judgment on both.

Both parties have submitted statements of undisputed facts

as called for by this District Court's LR 56.1.[1]  For the reasons

---

[1]  LR 56.1 implements Rule 56 by requiring the parties to
submit evidentiary statements and responses to such statements,
to highlight which facts are disputed and which are agreed upon.

set forth in this memorandum opinion and order, Orthodontic Centers' motion for partial summary judgment on Dr. Michaels' liability on five promissory notes is granted, while all other motions are denied--but as explained hereafter, the grounds for denial of each party's motion for summary judgment on its or her breach of contract claim also spell doom for that claim itself, and the same is true as to Dr. Michaels' breach of fiduciary duty claim.

## Rule 56 Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidence in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)). Ultimately summary judgment is

---

This opinion cites to the two LR 56.1(a)(3) statements as "O. St. ¶--" and "M. St. ¶--." Responses to those statements are cited "O. Resp. ¶--" and "M. Resp. ¶--," although only the initial statement is cited where its factual assertion is uncontroverted. LR 56.1(b)(3)(B) statements of additional facts are cited as "O. Add. St. ¶--" and "M. Add. St. ¶--." This opinion employs the same "O." and "M." designations in referring to exhibits ("Ex.").

appropriate only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). Where as here cross-motions for summary judgment are involved, these principles require the adoption of a Janus-like perspective: As to each motion, the nonmovant's version of any disputed and evidence-supported facts is credited.

## Background

Orthodontic Centers is a Delaware corporation with its principal place of business in Metairie, Louisiana (M. St. ¶1). It is a wholly owned subsidiary of Orthodontic Centers of America (hereafter simply "Centers," to distinguish it from the subsidiary that has filed this action), which has the same place of incorporation and principal place of business (<u>id</u>. ¶2). Dr. Michaels (the individual) is an Illinois-licensed dentist specializing in orthodontics and practicing through her Illinois professional corporation, Christine Michaels D.D.S., P.C., which also has its principal place of business here in Illinois (<u>id</u>. ¶¶3, 5, 6).

In 1996 Dr. Michaels and Orthodontic Centers entered into a Business Management Agreement ("Agreement"). Under Agreement §2.1 Orthodontic Centers was obligated to "provide or arrange for the provision to [Dr. Michaels] of the business management services required by [Dr. Michaels] to successfully operate [her] orthodontic practice" (O. St. ¶1). In particular, Orthodontic

Centers was responsible for hiring administrative staff,[2] leasing and subleasing office space, furnishing and equipment, providing patient scheduling systems and clinical forms, managing inventory, producing financial and operational data on the orthodontic office's operations, designing and executing a marketing plan and providing Dr. Michaels with a range of financial services (Agreement §§2.2-2.10). That range of services encompasses accounting and bookkeeping, payment of Dr. Michaels' accounts payable (including rent under leases and subleases), monitoring and payment of "Centers Expenses" (a defined term under the Agreement, including among other things staff salaries, corporate overhead expenses and licenses and taxes), payroll administration and billing and collections (id. §2.10). Orthodontic Centers established a bank account on Dr. Michaels' behalf and was appointed as Dr. Michaels' attorney-in-

---

[2] There is a dispute between the parties about whether Orthodontic Centers also hired part of Dr. Michaels' clinical staff. Under Agreement §3.1 Dr. Michaels was expressly made responsible for hiring the orthodontists and dental hygienists. Less clear, however, is who hired the dental assistants. There is no specific provision in the Agreement for the hiring and firing of dental assistants, although Agreement §4.4(c)(1) suggests that the dental assistants may have been employees of Orthodontic Centers. That provision says that Orthodontic Centers would be responsible for paying the "Centers Expenses," which encompasses the "[s]alaries, benefits, and other direct costs of all Centers staff, including dental assistants employed by [Orthodontic Centers]" (emphasis added).

4

fact to carry out those financial management responsibilities.[3]

In return for the services so provided, Orthodontic Centers was entitled under Agreement §4.1 to payment of a monthly "Management Fee," which it withdrew directly from Dr. Michaels' account. But there was clearly more to the parties' relationship than mere "management" as dealt with in the Agreement, for the financial records submitted by the parties shows that Orthodontic Centers also received 50% of the profits from Dr. Michaels' practice. There is no argument about that--indeed, until Centers wrote a letter to Dr. Michaels on November 18, 2002 (M. Ex. B at 756), ostensibly to accompany "a substantially new look to your financial statements," and stating that "[w]e've removed the antiquated notions of balance sheets and statements of cash flow as well as arcane accounting concepts such as partner drawing rollforwards and amortization periods," its financial statements forthrightly showed Dr. Michaels and Orthodontic Centers as "partners" and allocated 50% of the calculated net income to each (among the many statements reflecting that consistent treatment, see, e.g., M. Ex. B at 741, 743).[4]

---

[3] As will be discussed later, the parties disagree about the scope of Orthodontic Centers' appointment as Dr. Michaels' attorney-in-fact.

[4] "Arcane" indeed! As the later substantive discussion reflects, the just-referred-to original handling of the financial reporting for the operation of the orthodontic practice reflected the real world of the parties' relationship, which cannot be altered by Orthodontic Centers' attempt to paper it over (either

5

Under the Agreement the parties' relationship was to continue for 20 years unless earlier terminated on grounds specified in the Agreement. Those grounds were set out in Agreement §§6.2 and 6.3.

In addition to enlisting the business acumen of Orthodontic Centers, Dr. Michaels utilized its financial wherewithal by obtaining cash advances needed for the establishment of her practice. Between June 30, 1995 and June 30, 1996 Dr. Michaels executed five promissory notes in favor of Orthodontic Centers, reflecting advances in the total sum of $193,224 (O. St. ¶13; Paternostro Aff. Exs. B, C & D). Four of those promissory notes were executed by Dr. Michaels' corporation and one was executed by Dr. Michaels in her individual capacity (Paternostro Aff. Exs. B, C & D).

For a number of years the Agreement between Orthodontic Centers and Dr. Michaels proceeded amicably. It was not until 2003 that problems started to arise.[5] In June Dr. Michaels attended a meeting in Miami organized by other orthodontists (all of whom had comparable agreements with subsidiaries of Centers) and by attorneys from the law firm of Goldstein, Tanen & Trench P.A. to discuss the orthodontists' rights and options under those

literally or figuratively).

[5] Because most of the operative events relevant to this action occurred during that year, any event referred to hereafter without a year designation was a 2003 occurrence.

6

agreements. After the meeting Dr. Michaels expressed to Bart Palmisano ("Palmisano"), Centers' chief operating officer, her desire to terminate the Agreement (O. St. ¶5; M. Resp. ¶¶5, 27). Those negotiations ended without a resolution (O. St. ¶5; M. Resp. ¶5).

On August 23 Dr. Michaels then attended a second meeting in Miami to discuss her concerns and complaints and "to explore whether there was any interest in the orthodontists forming a group to pool funds to negotiate and/or litigate with [Centers] on more equal financial footing" (Michaels Aff. ¶19). At that meeting Centers served Richard Goldstein of the law firm and Dr. Ramos, a member of the orthodontist group, with a lawsuit for tortious interference with contract (M. Add. St. ¶19; M. Resp. Ex. 1 ¶18).

Just a few days later (on August 27) Dr. Michaels' staff members at her Lombard and Aurora offices discovered that they could not log on to WALRUS, Orthodontic Centers' patient scheduling, information and billing system (M. St. ¶20). Shortly after being alerted to the problem, an employee in the information technology department of Orthodontic Centers restored access to both offices (M. Resp. Exs. 9, 10). According to one of Dr. Michaels' staff members in the Lombard office, the Orthodontic Centers employee advised her that the shutdown was due to "some kind of litigation" (M. Resp. Ex. 9). On the

following day Palmisano called Dr. Michaels to apologize for the "computer glitch" and explained that the shutdown was the result of an inexperienced computer technician (O. St. ¶6; M. Resp. ¶6).

On August 29 Palmisano sent what appears to be a form letter to Dr. Michaels, explaining the pending litigation against Richard Goldstein and Dr. Ramos, notifying Dr. Michaels that Centers would defend itself "vigorously" if claims were brought against it and encouraging Dr. Michaels to alert Orthodontic Centers to any problems that she may be having with their services (Buchman Aff. Ex. B). Before she received that letter, on September 5 Dr. Michaels sent a notice to Palmisano stating that she believed Centers had interfered with her ability to treat patients and repudiated the Agreement by "locking [her] practice out of Walrus." As a result she "no longer deem[ed] the [Agreement] to be in effect" (Paternostro Aff. Ex. A).

Only a month later Centers and all of its subsidiaries filed suit in a Texas state court against Dr. Michaels and numerous other orthodontists and attorneys, charging them with tortious interference and conspiracy (M. Add. St. ¶25). Dr. Michaels appears to have been dismissed as a party to that litigation, which ultimately settled out of court (see <u>Orthodontic Centers of America v. Locke, Liddell & Sapp, L.L.P.</u>, No. 14-04-00516, 2005 WL 1404440 (Tex. App. 14th Dist. June 16)).

There is then a gap in the record as to events that may have

8

transpired between October 2003 and the next recorded communication between the parties. That occurred on July 21, 2004, when Centers wrote Dr. Michaels that she had not made her contractual payments since September 5, 2003, that she was obligated under the Agreement to do so and that she should communicate with Orthodontic Centers to become current in her obligations and avoid the necessity of litigation (O. St. ¶12). Following Dr. Michaels' refusal to pay, Orthodontic Centers brought suit.

## Orthodontic Centers' Claims

Orthodontic Centers argues that Dr. Michaels breached the Agreement when she terminated it on September 5, 2003 without adhering to the procedure set forth in Agreement §6.2. In response, among other defenses, Michaels contends that the Agreement is void because it enables Orthodontic Centers to practice dentistry in contravention of the Illinois Dental Practice Act ("Act," 225 ILCS 25/1 to 25/57).[6]

In material part the Act outlaws the unlicensed practice of dentistry. Act §§8 and 37 prohibit generally the "practice of dentistry" by any person not holding a valid and current license. More specifically in terms of the issues posed by this litigation, Act §44 provides:

---

[6] All further statutory references will take the form "Act §--," omitting the prefatory "225 ILCS 25/."

9

> No corporation shall practice dentistry or engage therein,
> or hold itself out as being entitled to practice dentistry,
> or furnish dental services or dentists,...or advertise or
> hold itself out with any other person or alone, that it has
> or owns a dental office or can furnish dental service or
> dentists....

That section does contain several exceptions to the blanket
prohibition, including permission to any corporation to furnish
clerical services (Act §44(c)) and permission to dental
management services organizations (an undefined term) to provide
"non-clinical business services that do not violate the
provisions of this Act" (Act §44(g)). Any corporation that
violates Act §44 "is guilty of a Class A misdemeanor" (Act §44's
final sentence).

Illinois courts have had no occasion to analyze Act §44.
There is, however, relevant caselaw regarding the closely related
concept of the corporate practice of medicine, as well as a rule
of construction embedded in the Act, both of which aid this
Court's interpretive task. Thus when the Illinois Supreme Court
first addressed the notion of such corporate practice of
dentistry in Dr. Allison, Dentist, Inc. v. Allison, 360 Ill. 638,
642, 196 N.E. 799, 801 (1935), it spoke in the strongest terms of
"the inappropriateness of any corporate attempt to practice one
of the learned professions, involving personal and confidential
relations"--and it refused to grant any relief to the corporate
plaintiff. That concept, firmly grounded in the public interest,
has been upheld repeatedly by Illinois courts (see, e.g., Carter-

<u>Shields v. Alton Health Institute</u>, 201 Ill.2d 441, 458, 77 N.E.2d 948, 957 (2002))--and the public interest is specifically made one of the animating purposes underpinning the Act itself. In that respect Act §2 states that "[t]he practice of dentistry in the State of Illinois is hereby declared to affect the public health, safety and welfare," so that the express vesting of nondelegable duties in licensed dentists requires that the Act "be liberally construed to carry out these objects and purposes" (<u>id</u>.). Even more pointedly, Act §37 begins with this declaration:

> The practice of dentistry by any person not holding a valid and current license under this Act is declared to be inimical to the public welfare, to constitute a public nuisance, and to cause irreparable harm to the public welfare.

Dr. Michaels points to a number of provisions in the Agreement that she believes run afoul of the Act's proscription of prohibited conduct.[7] In particular she contends that the

---

[7] Dr. Michaels, as Orthodontic Centers points out, spends much of her time discussing the ways in which the Agreement violates Act §§8 and 17. Act §8 sets forth the basic rule requiring licensing, while Act §17 provides a list of acts constituting the practice of dentistry for the purpose of the Act. Although those sections are indeed germane to the issue, Dr. Michaels fails to mention or analyze the Agreement under the obviously most relevant provision--Section 44--with its broad generic prohibition and its more narrowly defined exceptions. Dr. Michaels also frequently cites to litigation in other jurisdictions as assertedly bearing on the legality of the business arrangements set up by Orthodontic Centers of America or other similar entities. But as <u>Clower v. Orthalliance, Inc.</u>, 337 F.Supp.2d 1322, 1329 (N.D. Ga. 2004) has aptly explained, those "decisions are all highly dependent on the specific state laws in

11

employment and financial management arrangements established under the Agreement and the Agreement's non-compete clause all enable Orthodontic Centers to practice dentistry in violation of the Act. To support that argument Dr. Michaels has attached a copy of the Agreement, a number of affidavits and--most significantly--Centers' Form 8-K report filed just last month with the SEC (M. Add. St. ¶37 and Ex. 8).

While the Agreement's language may or may not of itself establish an improper relationship between the parties,[8] Centers' own statement in its Form 8-K report confirms its (and hence Orthodontic Centers') violation of Act §44. That report states in pertinent part (M. Add. St. ¶13; M. Ex. 8)(emphasis added):

> Before the issuance of Staff Accounting Bulleting 101 ("SAB 101") by the SEC in December, 1999, <u>we considered ourselves to be a partner in nationwide orthodontic practices and considered our revenues to be derived from</u>

question." Because none of those cases offers an analysis of Illinois law, they offer no real guidance here.

[8] For example, Dr. Michaels argues that the Agreement violated the Act because it enabled Orthodontic Centers to hire Dr. Michaels' clinical staff (see Michaels Aff. ¶37). As n.2 reflects, the Agreement does not specify who is responsible for hiring dental assistants (as contrasted with orthodontists and dental hygienists). Drawing all inferences in Dr. Michaels' favor might suggest reading the provision in Agreement §4.4(c)(1) as requiring Orthodontic Centers to employ the clinical staff, in direct violation of Act §37(4), which specifically prohibits an unlicensed person from exercising "direction or control, by written contract, license, or otherwise, over a dentist...[with regard to] final decisions relating to employment of dental assistants and dental hygienists." On the other side of the coin, drawing inferences the other way (on Dr. Michaels' Rule 56 motion) could call for a different reading.

12

direct service to patients. After SAB 101, and after long discussions with our accountants and the SEC staff, we revised our view and considered ourselves an orthodontic practice support firm whose revenues were derived from administrative services to our doctors....

With the issuance in December 2003 of revised Financial Accounting Standards Board Interpretation No. 46 ("FIN 46"), we again tested our relations with our doctors and determined on the basis of the FIN 46 guidance that we were indeed an orthodontic practice for financial reporting purposes and therefore must recognize our revenue on that basis under SAB 101 and FIN 46....[B]ecause we are the only publicly traded orthodontic practice, we have no peer guidance or rulings to look to for assistance in developing methods that comply with SAB 101 or FIN 46.

By thus overtly confirming that it is an "orthodontic practice" and, as such, derives its revenues from the direct servicing of patients, Centers (speaking for each of its subsidiaries, including Orthodontic Centers) has held itself out as owning and running an orthodontic practice, in direct contravention of Act §44.[9] Although voiced long ago in a four-Justice dissenting opinion, the statement by Justice Douglas (who had earlier been the SEC's Chairman) in Scherk v. Alberto-Culver Co., 417 U.S. 506, 527 n.6 (1974) that a Form 8-K filing is required of a company whenever substantial events occur impacting the security was good law then and remains good law today. Those public filings are intended not only "to protect investors through the requirement of full disclosure" but also to attract investment into a company (Tcherepnin v. Knight, 389 U.S. 332,

---

[9] Under the Act, orthodontics is considered to be a specialized branch of dentistry (see Act §4(1)).

13

335 (1967)).

In the present context it is really irrelevant that SEC filings are prescribed in the primary interest of investors rather than of those seeking dental care. What controls instead is that the SEC's requirements are for the protection of the public, just as are the requirements of the Act (it will be remembered that the Illinois General Assembly has mandated that the Act be broadly construed[10]). Centers (and hence Orthodontic Centers) cannot represent to the broader public that it is an orthodontic practice to induce investment on the one hand, while on the other hand disclaiming that representation as somehow limited in scope. That representation, although filed with the SEC, is broadcast to the public at large--and that public includes the universe of prospective consumers in the dental services market as well.

Orthodontic Centers has sought to wriggle out of Centers' month-old acknowledgment that it is indeed "the only publicly-traded orthodontic practice" by pointing to its year-old quarterly SEC filing (Form 10-Q) that disclaimed such status in this fashion:

OCA [Centers] does not hold any ownership interest in

---

[10] Kaplan v. Tabb Assocs., Inc., 276 Ill.App.3d 320, 323, 657 N.E.2d 1065, 1067 (1st Dist. 1995) explains that "a liberal construction is ordinarily one which makes a statute apply to more things or in more situations than would be the case under a strict construction."

14

the Affiliated Practices [such as Dr. Michaels'] and
does not employ the orthodontists or other
practitioners in the Affiliated Practices. The
patients who are parties to patient contracts with
Affiliated Practices are the patients of the Affiliated
Practices, not patients of OCA. OCA does not practice
orthodontics or other forms of dentistry, and is
prohibited from doing so by the laws of each
jurisdiction in which the Company operates.

That effort to blur (or to eliminate entirely) the true
significance of its total involvement in the orthodontic practice
simply won't fly--not only because Centers' earlier-quoted Form
8-K statement was more recent and obviously made with full
knowledge of what had gone before, but more importantly because
that most recent admission comports with reality.[11]

In that respect Orthodontics Centers attempts to put a false
face on the matter by stating in its just-filed Supp. Reply at 3
(emphasis in original):

Conspicuously, Michaels has not shown--or even
attempted to show--how the manner in which OCA
determined its revenues and other financial information
for public reporting purposes could have affected the
contractual relationship between OCS and Michaels, P.C.
or overridden any provision of the BMA.

That seeks to obscure the real points (1) that Centers was of

---

[11] This Court has often had occasion to refer to an aphorism
attributed to Abraham Lincoln (emphasis in original):

> If you call a tail a leg, how many legs has a
> dog? Five? No, calling a tail a leg don't
> make it a leg.

In the same way, Centers' earlier attempted disavowal of its
currently acknowledged status as an orthodontic service "don't
make it" so.

course speaking in its Form 8-K of the contractual relationships between each of its subsidiaries (such as Orthodontic Centers) and the Affiliated Practices (such as Dr. Michaels') and (2) just as significantly, that the SEC-compelled acknowledgment reflected in the Form 8-K does not "override" the Agreement but rather portrays its effect in its true light.

In part Orthodontic Centers' wriggle-out effort seeks to draw a line between itself and Centers (the SEC-reporting entity), and in part it says that Centers was speaking differently during the term of the Agreement than it now does. But as to the first part, that effort to separate the current litigant from its parent is smoke and mirrors: What Centers has so recently confirmed is the relationship that each of its subsidiaries such as Orthodontic Centers has with dentists such as Dr. Michaels. And as to the second part, the Form 8-K itself recognizes that the truth it speaks was always the truth: There has been no change in the actual relationship between the subsidiaries such as Orthodontic Centers and dentists such as Dr. Michaels, only a change in the recognition forced on Centers by the SEC.

By definition every corporation--a law-created concept of a disembodied entity--acts through individual human beings. Hence it will not do for any corporation to say "we [the disembodied entity] didn't do it--those people [the human beings] did."

16

In this instance Orthodontics Centers cannot gainsay, in addition to the congeries of other factors that go to make up its interrelationship with Dr. Michaels, that it receives 50% of Dr. Michaels' net profits. When all the underbrush of attempted disclaimer is cleared away, that means that of every dollar derived from patient care--from the practice of dentistry--by Dr. Michaels individually and by any other orthodontists and dental technicians working in Dr. Michaels' facility, 50 cents less a ratable part of the associated expenses[12] go directly into Orthodontic Centers' corporate pocket. Orthodontic Centers cannot divorce itself from that economic reality by protesting that the people in the fruits of whose personal service efforts it shares--efforts that provide patient care--are not formally on its payroll.

Little wonder that the SEC accounting standards reflect that reality and compel what is a fatal admission by Centers, speaking of and for Orthodontic Centers and its other subsidiaries. In short, Orthodontic Centers' attempted switch-hitting will not be sanctioned in this Court.

This leaves then the question of what to do with the Agreement. Under Illinois law, "when a statute declares that it

---

[12] As is required on Orthodontic Centers' motion, for present purposes this opinion does not credit Dr. Michaels' contention that some of the expenses included by Orthodontic Centers in making that calculation were improperly charged.

17

shall be unlawful to perform an act and imposes a penalty for its violation, contracts for the performance of an act are void and incapable of enforcement" (Aste v. Metro. Life Ins. Co., 312 Ill.App.3d 972, 980, 728 N.E.2d 629, 635 (1st Dist. 2000)). As Ransburg v. Haase, 224 Ill.App.3d 681, 684-85, 586 N.E.2d 1295, 1297 (3d Dist. 1992)(quoted in Aste) teaches:

> As a general rule, courts will not enforce a contract involving a party who does not have a license called for by legislation that expressly prohibits the carrying on of the particular activity without a license where the legislation was enacted for the protection of the public, not as a revenue measure.

Here the Act confirms all of those criteria. It both declares it unlawful for a corporation to hold itself out as owning and operating a dental office and imposes a criminal punishment for its violation. And the Act also states unambiguously that the regulations it contains are motivated by a desire to serve the public interest. Thus the Agreement, the mechanism through which Orthodontic Centers engages in its business and the basis on which it holds itself out unlawfully as being engaged in an orthodontic practice, is void and incapable of enforcement.

Almost without exception, parties to such a void contract will be left where they have placed themselves (see, in addition to Ransburg and cases cited there, such cases as Broverman v. City of Taylorville, 64 Ill.App.3d 522, 527, 381 N.E.2d 373, 376 (5th Dist. 1978)). It is true that in a context wholly different

18

from the present one Illinois caselaw has recognized two limited exceptions to that rule: (1) where the parties are not in pari delicto (that is, where the party seeking relief is not similarly culpable) or (2) where the law that makes the contract unlawful is intended for the protection of the party seeking relief (Ransburg, 224 Ill. App.3d at 686, 586 N.E.2d at 1298-99). But even a brief analysis makes it obvious that neither exception applies to Orthodontic Centers to begin with, even if it could somehow qualify to seek relief under those exceptions.[13]

As to the first potential escape hatch, Orthodontic Centers is the unlicensed party that has unlawfully held itself out as capable of providing dental care. It can hardly be argued that Orthodontic Centers is "comparatively the more innocent" under such circumstances (Ransburg, id. at 687, 586 N.E.2d at 1299). And as for the second possibility, the Act was designed to protect patients, not to protect corporations--particularly those

---

[13] As the discussion in Ransburg reflects, those exceptions address the situation where a party (say a dental patient) seeks to recover from an unlicensed party (say an unlicensed dentist) money that was previously paid for services for which a license was required. Here by contrast we have a situation in which it is the unlicensed (and unlicensable) party that seeks to obtain payment for services. In that context Ransburg, id. confirms that Illinois courts consistently reject such efforts. So the stated exceptions would not at all lend comfort to Orthodontic Centers--but the issue is nonetheless addressed here, both out of a superabundance of caution and because the exceptions would have to be discussed later in connection with Dr. Michaels' cross-motion in any event (for her situation is reasonably related to that dealt with in Ransburg, as Orthodontic Centers' is not).

19

corporations violating its proscriptions.

In sum, Orthodontic Centers cannot enforce the Agreement.
Its motion for summary judgment on its breach of contract claim
is denied--to the contrary, Dr. Michaels is entitled to judgment
as a matter of law in that respect.

## Recovery on the Promissory Notes

Orthodontic Centers additionally moves for partial summary
judgment establishing Dr. Michaels' liability for the unpaid
balance due on the five promissory notes referred to earlier.
Because analysis reveals that the already-described taint
attached to Orthodontic Centers' services does not extend to the
notes, and because there is no genuine issue of material fact as
to Dr. Michaels' liability on those notes, Orthodontic Centers is
entitled to the relief that it seeks.[14]

It is undisputed that the notes stemmed from an early stage
in the parties' relationship, reflecting the obligation to repay
amounts advanced by Orthodontic Centers to facilitate Illinois-
licensed orthodontist Dr. Michaels' establishment of her own

_____

[14] At this point Orthodontic Centers asks only to establish
Dr. Michaels' liability on the notes, not the amount of that
liability.    District courts may grant partial summary judgment
as to a party's liability under a promissory note and reserve for
future determination the quantification of that liability (see,
e.g., Washington v. S. Shore Bank, No. 02 C 7403, 2004 WL
2038425, at *3 (N.D. Ill. Aug. 27)). Although Dr. Michaels
contends that she is not liable for the full principal and
interest due on the notes because she has already paid a portion
of the outstanding balance, that issue remains for such future
determination.

20

practice. They were not reflective of fees or other payments due to Orthodontic Services for its services under the Agreement or otherwise.[15] Because the creation of Dr. Michaels' practice was of course perfectly legal under the Act, the promissory notes can be enforced by Orthodontic Centers so long as it "can establish [its] claim without requiring the aid or proof of the illegal contract" (Central Republic Trust Co. v. Evans, 378 Ill. 58, 70, 37 N.E.2d 745, 751 (1941)).

Orthodontic Centers need not rely on the illegal Agreement at all.[16] Dr. Michaels has not contested the signatures on the promissory notes, nor has she disputed the fact that Orthodontic Centers is the holder of those notes (M. Resp. St. ¶13). Nor does Orthodontic Centers need to rely on the Agreement to rebut Dr. Michaels' single defense on the issue of liability. On that score Dr. Michaels urges that because Orthodontic Centers was her fiduciary under the Agreement and because Orthodontic Centers'

_____

[15] Indeed, at least three of the notes were executed before the Agreement was executed, and all the notes are silent as to the existence of the Agreement.

[16] It is true that Orthodontic Centers refers to Agreement §6.4(A)(v) as an additional basis for claiming that all money owed on the promissory notes is due. But that is not needed to show that the notes have matured: As Orthodontic Centers correctly explains, under the terms of the notes the principal and interest became due after September 5, 2003, when Dr. Michaels stopped making payments. Central Republic Trust, 378 Ill. at 70-71, 37 N.E.2d at 751 instructs that "[t]he mere fact that the plaintiff did introduce other evidence [that relies on the illegal transaction] before it became necessary does not change" the ability of the plaintiff to recover.

21

actions caused a delay in her payment of the notes, it is precluded from recovering any money due on those notes.

In that regard, although a determination of whether Orthodontic Centers was Dr. Michaels' fiduciary might require recourse to the illegal Agreement, Orthodontic Centers correctly responds that Dr. Michaels is liable on the principal regardless of whether Orthodontic Centers was her fiduciary and breached any fiduciary duty (see, e.g., Smith v. First Nat'l Bank of Danville, 254 Ill.App.3d 251, 265-67, 624 N.E.2d 899, 910-11 (4th Dist. 1993)). Because relief based on such a breach would call for the equitable remedy of rescission (here the repayment of the funds advanced by Orthodontic Centers), the finding of such a breach would only excuse Dr. Michaels from paying the interest that has accrued on the notes (id.).

Thus Orthodontic Centers' partial motion for summary judgment is granted as to Dr. Michaels' liability for whatever is later determined to be the remaining amount due on the promissory notes. Ultimate judgment in that respect remains for the future.

## Dr. Michaels' Breach of Contract Counterclaim

For her part, Dr. Michaels has moved for summary judgment on her two counterclaims for breach of contract and breach of fiduciary duty. Neither branch of her motion succeeds.

As to the former, Dr. Michaels asserts that Orthodontic Centers improperly reimbursed itself for certain corporate

22

overhead expenses. Under Agreement §4.3 Orthodontic Centers was "responsible for the payment of all Centers Expenses...without reimbursement by the Orthodontic Entity, unless otherwise agreed to by the parties hereto." As already noted, Centers Expenses include a multitude of items such as staff salaries, taxes and fees, lease amounts, liability insurance premiums and "corporate overhead charges and expenses." According to Dr. Michaels, while she agreed to pay for certain Centers Expenses such as lease amounts, she never agreed to pay for corporate overhead expenses.

It is unnecessary to engage in a full analysis of Dr. Michaels' claim. Because the Agreement has already been held to be void, Dr. Michaels can enforce its provisions only if she falls within one of the earlier-discussed exceptions to the rule against recovery on a void contract: either because she is not in pari delicto with Orthodontic Centers or because the General Assembly intended to protect her under the Act.[17]

As to the first of those exceptions, Dr. Michaels has not--even with the benefit of favorable inferences--created a general issue of material fact as to her not being in pari delicto with Orthodontic Centers. To succeed in that regard, Dr. Michaels must provide "some pleading or evidence that [she] had no knowledge of the illegality and that [Orthodontic Centers]

---

[17] Unlike Orthodontic Centers' inability to qualify under those exceptions as a matter of principle (see n. 13), Dr. Michaels might legitimately attempt to do so.

23

did" (O'Hara v. Ahlgren, Blumenfeld & Kempster, 158 Ill.App.3d 652, 565, 511 N.E.2d 879, 882 (1st Dist. 1987)). Dr. Michaels has submitted no evidence at all to that effect. Instead her only tendered evidence has focused on the terms of the Agreement and on the financial statements that Orthodontic Centers provided to her, in which Orthodontic Centers described itself as a "partner" and retained 50% of the practice's profits. To adapt O'Hara's language to this case (id.):

> Absent...evidence or pleading disclosing [Dr. Michaels'] lack of knowledge of illegality and [Orthodontic Centers'] awareness of same, it would appear that the parties were in pari delicto.

Dr. Michaels fares no better as to the second exception referred to above. Even though the licensure of professionals might perhaps be viewed by the skeptic as motivated by protectionism, the Illinois courts have rejected such a perspective. What has been said for nearly 90 years and has been reiterated as recently as in Ransburg, 224 Ill.App.3d at 685, 586 N.E.2d at 1298 as to the practice of architecture applies with equal force to the Act's regulation of the practice of dentistry:

> The statute was not intended to protect architects by limiting the work to licensed architects. Rather, its real purpose was to protect the public from damage caused by the work of incompetent and unlicensed architects.

Such regulation has as its focus the need to "safeguard[ ] the public health and welfare" (Carter-Shields, 202 Ill.2d at 458, 77 N.E.2d at 957).

24

So Dr. Michaels cannot recover under Rule 56 on her counterclaim for breach of the Agreement. And as with Orthodontic Centers' like motion, what has been said here also precludes any recovery on that claim on the merits.

### Dr. Michaels' Breach of Fiduciary Duty Counterclaim

Dr. Michaels additionally argues that by reimbursing itself for corporate overhead expenses, Orthodontic Centers breached its fiduciary duty to Dr. Michaels. According to Dr. Michaels such a fiduciary duty arose from her appointment of Orthodontic Centers as her attorney-in-fact for all of the functions listed in Agreement §2.10, including the payment of Centers Expenses. Orthodontic Centers disputes that reading of Agreement §2.10, positing that it was named as Dr. Michaels' attorney-in-fact only for billing and collections. But that dispute as to the scope of the attorney-in-fact designation need not be resolved, because any potential recovery on Dr. Michaels' breach of fiduciary duty claim would again require this Court to enforce the illegal Agreement.

By contrast, Holstein v. Grossman, 246 Ill.App.3d 719, 616 N.E.2d 1224 (1st Dist. 1993) involved a contract for the referral of clients from one attorney to another. Although the court denied the plaintiff's Count I claim for breach of contract, it held that the plaintiff could recover on his Count II breach of fiduciary duty claim. In that regard Holstein, id. at 742, 616

N.E.2d at 1239 explained:

> Unlike count I, plaintiff's recovery under count II
> does not require this court to enforce an agreement
> which is unenforceable on public policy grounds.

In this case, however, this Court would have to enforce the
underlying Agreement for Dr. Michaels to succeed on her breach of
fiduciary duty claim. More specifically, it would be necessary
to interpret the scope of and to enforce not only the attorney-
in-fact appointment in Agreement §2.10 but also a host of other
provisions in which the parties allocate responsibility for
Centers Expenses: Agreement §§4.3 (Centers Expenses generally),
2.2, 3.9 and 4.1(b) (rents), 2.8 (marketing), 2.11 (staff
salaries), 3.6 (licenses/taxes/fees) and 5.2 (liability
insurance).

Thus Dr. Michaels' breach of fiduciary duty claim also fails
at the summary judgment stage. And based on the just-completed
analysis, that claim too is fatally deficient on the merits.

## Conclusion

Because the Agreement is void and unenforceable as a matter
of law, neither party is entitled to recover on its or her breach
of contract claims, nor is Dr. Michaels able to recover on her
breach of fiduciary claim. Indeed, all of those claims are
extinguished as a matter of law. Only Orthodontic Centers' claim
for Dr. Michaels' liability on the five promissory notes
survives--and on that issue alone this Court grants summary

judgment in favor of Orthodontic Centers as to liability. This
action is set for a status hearing at 8:45 a.m. December 20, 2005
to discuss the procedure and timetable required to establish the
amount of that liability.

Milton I. Shadur
Senior United States District Judge

Date:   December 13, 2005

27